OPINION
{¶ 1} This appeal involves questions of financial misconduct of the guardian of two minor children, as well as the liability of the guardian's bond company and the institution where the guardianship funds were deposited. The two wards are Adrienne Thomas (d.o.b. 7/21/86) and Kerri Jo Thomas (d.o.b. 5/18/91). The need for the guardianships arose when their mother, Susan Thomas, was killed in a car accident. The two children were in the vehicle at the time and were both severely injured. Appellant John R. Thomas ("Mr. Thomas"), Susan's surviving spouse and father of the two girls, was appointed as the legal guardian. The girls received uninsured motorists benefits arising from the accident, and this money was placed into sequestered accounts by the probate court. The girls later received wrongful death benefits that were put into the same sequestered accounts. Mr. Thomas withdrew various amounts from those accounts without receiving court approval and without accounting for the withdrawals. He was removed as guardian, and a successor guardian, Appellee James W. Peters, was appointed. After lengthy proceedings, the Monroe County Court of Common Pleas, Probate Division, found Mr. Thomas liable for over $67,000 in mismanaged funds in the two guardianships, and further ordered the bonding company, Appellant Ohio Casualty Insurance Company ("Ohio Casualty"), to pay the judgment after 21 days. The court also found that the bank where the funds were held, Appellant First Investors Corporation ("First Investors"), was jointly liable because it allowed the funds to be withdrawn without a court order. Mr. Thomas, Ohio Casualty, and First Investors all filed appeals. *Page 2 
 {¶ 2} One of the preliminary questions in this complex appeal is whether the probate court obtained jurisdiction over First Investors. The record reflects that First Investors submitted itself to the jurisdiction of the court by signing a court-ordered verification when it accepted the initial deposits, and it appears that notice of subsequent court proceedings was made on various corporate offices of the bank. Our review of the record reflects that the probate court did have jurisdiction to find First Investors liable for improperly releasing funds from the guardianship accounts.
 {¶ 3} An additional fundamental question on appeal is whether the probate court had any jurisdiction in this matter over the funds held for Adrienne Thomas once she reached her 18th birthday. A recent ruling of the Ohio Supreme Court, however, makes it clear that a probate court retains limited jurisdiction for consideration and settlement of a guardian's final account after the ward has reached the age of majority. See In re Guardianship of Hollins, 114 Ohio St.3d 434, 2007-Ohio-4555, 872 N.E.2d1214. Therefore, the probate court in the instant case had proper jurisdiction to resolve the wide variety of issues surrounding the final accounting process in Adrienne's guardianship even after Adrienne had reached her majority.
 {¶ 4} While all of the Appellants claim that someone else is liable for the losses to the guardianship estates, pursuant to R.C. 2109.13, the depository bank is liable for releasing funds from a sequestered account without obtaining prior court authorization. The guardian loses its immunity from liability by not acting in good faith. The probate court made what appears to be a finding of a lack of good faith. *Page 3 
Thus, the depository bank, the guardian, and the guardian's bonding company are all liable for losses to the guardianship estates and this matter must be affirmed.
 HISTORY OF THE CASE {¶ 5} On September 19, 1998, Susan M. Thomas, mother of Adrienne and Kerri Jo and wife of John R. Thomas, was killed in an automobile accident near Malaga, Ohio. Her automobile was struck by a stolen vehicle driven by an uninsured motorist. Adrienne and Kerri Jo were in the car during the accident, and they both suffered serious injuries. Adrienne was 12 years old at the time, and Kerri Jo was 7. Susan and the girls had uninsured motorists coverage under a policy issued by State Farm Insurance Company.
 {¶ 6} Mr. Thomas was named the personal representative of his wife's probate estate. The estate was filed in Monroe County Court of Common Pleas, Probate Division, Case No. 8264.
 {¶ 7} On October 19, 1999, Mr. Thomas was appointed as legal guardian for both girls in the Monroe County Court of Common Pleas, Probate Division, under Case Nos. 1999GDM8303 and 1999GDM8304.
 {¶ 8} On November 24, 1999, State Farm issued checks for UM benefits in the amounts of $100,000 to Adrienne and $27,000 in UM benefits to Kerri Jo. On December 29, 1999, State Farm approved a settlement for those amounts, disposing of the UM claims of the two girls, and the funds were immediately deposited in two separate accounts with First Investors. These were sequestered accounts in lieu of bond pursuant to R.C. 2109.13, opened in the name of the wards and with the funds to be released to the wards at age 18. An officer of the bank, Mr. Timothy D. Black, *Page 4 
signed "Verification of Receipt and Deposit" forms for each deposit. These forms were modeled after the standard probate form found in Sup. R. 51, Form 22.3.
 {¶ 9} The verification forms stated: "By accepting said deposit for said minor, this institution agrees that said deposit, together with accumulated interest, shall be held and no part thereof released until minor attains the age of majority or upon further order of this Court." When this type of language is used to deposit funds, the accounts are referred to as "impounded accounts" or "sequestered accounts." The verification forms were captioned with the name of the Probate Court of Monroe County, and the probate guardianship case numbers were listed on the forms. There is no indication that First Investors considered or could consider the initial deposits as anything other than sequestered account funds.
 {¶ 10} Mr. Thomas, as guardian, posted bonds of $200,000 and $54,000, respectively, in the two guardianship cases.
 {¶ 11} On December 23, 1999, Mr. Thomas (as personal representative of the estate of Susan Thomas) initiated wrongful death proceedings in Monroe County, Case No. 8264. In the wrongful death action, State Farm proposed a settlement of $103,000 in UM benefits. The probate court and Mr. Thomas (as personal representative) approved the settlement on February 8, 2000, and further proceedings were held to divide the proceeds among various beneficiaries. It was determined that $11,000 would be allocated as expenses and attorney fees, $12,000 would go to Jennifer Majors (an emancipated daughter of the Thomas'), and $40,000 each was ordered to Adrienne and Kerri Jo, payable at the time to their guardian. None of the settlement was ordered for the benefit of Mr. Thomas. Mr. Thomas *Page 5 
signed an approval of the settlement on February 28, 2000, and signed the distribution order on March 10, 2000. The report of distribution was accepted by the court on March 31, 2000.
 {¶ 12} Mr. Thomas received the two checks on behalf of his daughters for $40,000 each from State Farm and deposited these funds with First Investors. The funds were deposited in the sequestered accounts previously set up for the wards. There is no evidence that the bank was required to sign additional verification forms in order to accept these two deposits into the sequestered accounts.
 {¶ 13} The two sequestered accounts at First Investors were mutual fund accounts in which the deposits were actually used to purchase shares of the mutual fund. It does not appear that any separate bookkeeping was maintained to keep the initial deposits, which were sequestered funds, separate from the later $40,000 deposits, which were not separately ordered to be sequestered but which were nevertheless deposited into sequestered accounts. The total principal deposit for Kerri Jo was $67,000. Adrienne's total was $140,000.
 {¶ 14} Mr. Thomas failed to list the two $40,000 deposits from the wrongful death action in his inventory of the guardianship estates, so on March 24, 2000, the probate court ordered the $40,000 proceeds to be listed in each inventory by interlineation.
 {¶ 15} On January 18, 2002, Mr. Thomas filed two accounts showing the initial deposits of $27,000 and $100,000, and including the interest earned on those amounts, but failing to list or account for the later $40,000 deposits. The probate accounts did not mention any withdrawals, expenditures or distributions. *Page 6 
 {¶ 16} On May 3, 2004, Mr. Thomas filed two more probate accounts which again failed to mention the $40,000 deposits. The account for Kerri Jo listed $17,000 in redemption withdrawals, and Adrienne's account listed $32,000 in redemption withdrawals. Importantly, there were no court orders approving any withdrawals from either sequestered account up to this time.
 {¶ 17} On August 5, 2004, the court ordered Mr. Thomas to provide receipts for the withdrawals he had made from the accounts. On August 23, 2004, motions and summons in contempt were issued against Mr. Thomas in both guardianship cases. At a hearing on October 20, 2004, Mr. Thomas could not account for $72,000 from Adrienne's estate, and $57,000 from Kerri Jo's estate. In a judgment entry filed on October 21, 2004, the court found Mr. Thomas in contempt of prior court orders, determined that he should be removed as guardian, and appointed Attorney Paul Jefferis as a "suitable person" to investigate the administration of the guardianships pursuant to R.C. 2109.49. Both Ohio Casualty and First Investors were sent copies of this judgment entry and all filings hereafter.
 {¶ 18} On November 12, 2004, Attorney Jefferis reported to the court that there were no receipts for $44,074 missing from Kerri Jo's account, and no receipts for $49,377 from Adrienne's account.
 {¶ 19} On December 8, 2004, the court removed Mr. Thomas as guardian and enjoined First Investors from releasing any further funds from the two sequestered accounts. Attorney James W. Peters was appointed as successor guardian for both girls on December 23, 2004. *Page 7 
 {¶ 20} On February 7, 2005, the former guardian, Mr. Thomas, filed an account covering the entire period of the guardianships. Even after deducting every expense listed in his accounting reports, Mr. Thomas could not account for $14,069.40 in withdrawals from Kerri Jo's sequestered account and $21,801.51 from Adrienne's account.
 {¶ 21} On March 8, 2005, Attorney Peters filed objections to the proposed probate account, and filed a motion to surcharge Mr. Thomas for the deficiencies in both accounts. A new judge was appointed to oversee the case at this time. Various status conferences were held, and First Investors was joined as a party on July 28, 2005. The parties (including First Investors) engaged in settlement negotiations, but no settlement was reached and the case went to trial on July 27, 2006. The court approved many of the expenses listed in Mr. Thomas' proposed accounts, but ordered a surcharge against him of $38,758.47 in Adrienne's estate, and $29,183.82 in Kerri Jo's estate. The court found Ohio Casualty liable for these amounts if Mr. Thomas did not pay the surcharges within 21 days, and also gave Ohio Casualty the right to be indemnified by First Investors. Mr. Thomas and Ohio Casualty filed a joint appeal, and First Investors filed a separate appeal.
 FIRST INVESTORS ASSIGNMENT OF ERROR NO. 1 {¶ 22} "THE TRIAL COURT IMPROPERLY JOINED APPELLANT FIRST INVESTORS CORPORATION AS A PARTY TO THIS CASE SINCE THE SUCCESSOR GUARDIAN DID NOT PERFECT SERVICE OF PROCESS ON A DESIGNATED AGENT OF THE CORPORATION." *Page 8 
 {¶ 23} First Investors argues that it was not really a party to the proceedings, and therefore, is not bound by the results of the probate proceedings. First Investors argues that any complaint in this case was required to be served on its registered corporate statutory agent, and without such service, the probate court did not obtain personal jurisdiction and could not render a binding judgment. First Investors appears to acknowledge that it has participated in certain aspects of the proceedings, and was a part of settlement negotiations that ultimately failed. Nevertheless, it contends that it preserved its objection to lack of proper service of process, that the court did not establish personal jurisdiction, and that it is not bound by the court's judgment.
 {¶ 24} A trial court's ruling on a question of personal jurisdiction is reviewed de novo as a question of law. Information Leasing Corp. v.Jaskot, 151 Ohio App.3d 546, 2003-Ohio-566. A judgment in which personal jurisdiction has not been properly established is void ab initio.Money Tree Loan Co. v. Williams, 169 Ohio App.3d 336, 2006-Ohio-5568,862 N.E.2d 885, ¶ 8.
 {¶ 25} Courts generally begin with the presumption that service of process was proper unless the defendant rebuts this presumption with sufficient evidence of nonservice. Id. at ¶ 10. In adversarial proceedings, personal jurisdiction is generally obtained through the initial service of process of a complaint, although a party may waive its rights to service of process. Civ. R. 4(D). Objections to lack of personal jurisdiction arising from improper service of process may also be waived by failing to timely object in the manner provided by the Rules of Civil Procedure. Civ. R. 12(H). If a party has properly preserved the defense of insufficiency of service of process, that *Page 9 
party's active participation in subsequent litigation of the case is not treated as a waiver of the defense. Gliozzo v. Univ. Urologists ofCleveland, Inc., 114 Ohio St.3d 141, 2007-Ohio-3762, at syllabus. Personal jurisdiction may also be obtained by, "a voluntary entry of appearance on behalf of the defendant by way of an entry of the court".Maryhew v. Yova (1984), 11 Ohio St.3d 154, 156, 464 N.E.2d 538.
 {¶ 26} There are a number of ways of serving process of an initial complaint on a corporation pursuant to Civ. R. 4.2(F): "Upon a corporation either domestic or foreign: by serving the agent authorized by appointment or by law to receive service of process; or by serving the corporation by certified or express mail at any of its usual places of business; or by serving an officer or a managing or general agent of the corporation[.]" R.C. 1701.07 provides an alternative means of service of process on most corporations, but by its own terms does not apply to banks. See 1701.07(O).
 {¶ 27} The weakness of First Investors' argument is apparent from the outset. First, it is difficult for us to conclude from this record that First Investors actually preserved its defense of insufficiency of process. First Investors initially mentioned the defense of insufficiency of service of process in its timely "response" to the successor guardian's "Motion for Findings of Recovery." Yet, nowhere in the record does First Investors actually state to the probate court (or to this Court, for that matter) how or on whom service should have been made, nor does it state the specific nature of the alleged insufficiency of process. We do agree with First Investors' argument that the mere service of a pleading on counsel for a corporation is not one of the accepted methods of service on a corporation under Civ. R. 4.2, and *Page 10 
we have so held. Fay v. Blair (June 26, 2001), 7th Dist. No. 00 CA 166. On the other hand, there is nothing to prevent a corporation from designating an attorney as its agent for service of process.
 {¶ 28} Having scoured the record for First Investors' proof that service was improper, we find the following: an allegation in its August 19, 2005, response to the motion for findings of recovery that service of process was insufficient; an allegation in its trial brief filed on July 27, 2006, that service of process was insufficient; an allegation at the July 27, 2006, hearing that service of process was insufficient (Tr., p. 129.); and an allegation on appeal that service was improper. The record contains merely allegations that service was insufficient, not proof of any error in such service in any form.
 {¶ 29} Under normal circumstances, this might very well be the end of our analysis. An appellant is required to affirmatively demonstrate from the record that reversible error has occurred, and Appellant in this matter has not so demonstrated. The issue, though, has been complicated by the fact that the successor guardian, at oral argument, to some extent conceded that service of process of the "Motion for Findings of Recovery," filed on August 2, 2005, may not have been proper in this case. Therefore, we will determine what effect, if any, this possible failure has on the probate court's proceedings and its final judgment.
 {¶ 30} For a court to issue a judgment in personam, it is necessary for the court to obtain personal jurisdiction. Wainscott v. St.Louis-San Francisco Ry. Co. (1976), 47 Ohio St.2d 133, 137,351 N.E.2d 466. The judgment against First Investors consists of the following language in the probate court's final judgment: *Page 11 
 {¶ 31} "As to First Investor's Corporation, the Court renders judgment finding that said entity is jointly responsible for the mishandling of funds herein. However, the Court will not render any money judgment against them inasmuch as Ohio Casualty Insurance Company has recourse against them for indemnification." (10/11/06 J.E., p. 23.)
 {¶ 32} This judgment entry by the probate court does not appear to enter personal judgment against First Investors. The court made what is essentially a factual finding, while leaving any issue regarding personal monetary judgment to later proceedings to be initiated by Ohio Casualty, if necessary. Thus, the question is whether the probate court had sufficient jurisdiction to make a factual finding regarding First Investors' handling of the guardianship accounts.
 {¶ 33} There are multiple examples in the record establishing the jurisdiction of the probate court over First Investors and over the sequestered guardianship accounts. At the outset, First Investors voluntarily accepted the court's jurisdiction by signing the "Verification of Receipt and Deposit" forms for each deposit. First Investors does not argue that the bank officer who signed the form, Mr. Timothy D. Black, had no authority to do so. Furthermore, the verification form was modeled after the standard probate form found in Sup. R. 51, Form 22.3, and appears to be duly authorized by Ohio law. The verification form is clearly captioned with the name of the probate court and the guardianship case number. The form states, clearly and directly, that no funds shall be released until the minor attains the age of majority, "or upon further order of this Court." *Page 12 
 {¶ 34} Mere signature on this form demonstrates First Investors' voluntary submission to the personal jurisdiction of the probate court. This interpretation is inescapable. If First Investors did not voluntarily submit itself to the personal jurisdiction of the probate court when its representative signed the form, then the signature of First Investors' officer on the form would have absolutely no meaning. Furthermore, it was imperative that the probate court gain personal jurisdiction over First Investors by virtue of the deposit verification form so that the court could rely on its order contained within the form ordering First Investors to retain the funds until further court order. The court could not issue further binding orders if the initial order itself did not place First Investors under the personal jurisdiction of the court. If we would accept First Investors' view, the probate court could not issue any further binding orders regarding the accounts, even an order to release some or all the funds in the accounts, because the lack of personal jurisdiction would render all such orders void. This is an untenable position, and we can come to no other conclusion than that First Investors voluntarily submitted itself to the jurisdiction and the orders of the probate court when its officer signed the deposit verification form.
 {¶ 35} The probate court also possessed in rem jurisdiction over the guardianship accounts themselves. Actions in rem are proceedings against property rather than persons, or primarily directed against things in themselves. Moss v. Std. Drug Co. (1953), 159 Ohio St. 464, 470,50 O.O. 389, 112 N.E.2d 542. Most aspects of a guardianship are in rem in nature. In re Guardianship of Reynolds (1957), 106 Ohio App. 488,155 N.E.2d 686 (the appointment of a guardian is a proceeding in rem);Weigel v. Grossnickle (1954), 100 Ohio App. 106, 107, 135 N.E.2d 894 ("A *Page 13 
guardianship proceeding is a proceeding in rem and the exercise of jurisdiction by a Probate Court binds all the world.") First Investors could not simply ignore the court's orders or the court's accounting procedures regarding the sequestered guardianship accounts for reasons of personal jurisdiction when the court was primarily operating under the authority of in rem jurisdiction. In rem proceedings are not subject to the same rules governing service of process in adversarial proceedings.
 {¶ 36} Furthermore, a probate court has the authority to render findings regarding a guardianship account against any person who has been given sufficient notice of the proceedings. In re Guardianship ofJadwisiak, (1992), 64 Ohio St.3d 176, 183, 593 N.E.2d 1379. R.C. 2109.33
gives the probate court the authority to serve notice of a guardianship accounting, "upon any person who is interested in the estate or trust." Such notice does not need to conform to strict service of process requirements pursuant to Civ. R. 4.2. Instead, it is reviewed on general due process grounds. In re Guardianship of Bissmeyer (1988),49 Ohio App.3d 42, 43, 550 N.E.2d 210. Due process is satisfied with, "notice reasonably calculated, under the circumstances, to apprise [them] of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank Trust Co. (1950),339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865.
 {¶ 37} The Ohio Supreme Court in Jadwisiak discusses some of the jurisdictional distinctions between "in rem" versus "in personam" aspects of guardianship proceedings. In Jadwisiak, a Florida attorney was held in contempt by the Ottawa (Ohio) County Probate Court for failing to remit settlement proceeds from a product liability claim. Florida and Ohio counsel had been working together to *Page 14 
obtain the settlement for the ward, who had been injured in a motorcycle accident in Florida. The attorneys agreed to a 50% contingency fee, and the Florida and Ohio counsel agreed to split that contingency fee in equal halves. The tortfeasor later offered $1,050,000 in settlement. The Florida attorney traveled to Ohio to obtain the guardian's signature on a settlement release. After the settlement was obtained, the Florida attorney determined that he should retain more than 50% of the attorney fees because he had done more than half the work to obtain the settlement. The Florida attorney retained $550,000 of the settlement as attorney fees, and remitted the remaining funds to the guardian.
 {¶ 38} The probate court scheduled a hearing to decide whether to approve the settlement and to determine how to disburse the settlement funds. The Florida attorney was not properly served with notice of this hearing.
 {¶ 39} The probate court, "relying on its jurisdiction in all matters relating to settlement of personal injury claims of the ward," ratified the settlement and issued ex parte orders on March 2, 1988. Id. at 177. The court ordered the Florida attorney to remit all the proceeds of the settlement to the court and ratified the 50/50 attorney fee split. In its journal entry, the court directed all attorneys involved to provide evidence of cash advances so that the court could determine the attorney fees still due each.
 {¶ 40} The Florida attorney did not remit the funds, and a contempt citation was issued. The Florida attorney did not appear at the contempt hearing, but he was represented by counsel who argued, in part, that the probate court did not have personal jurisdiction over the attorney. The court overruled the argument, noting that personal jurisdiction was obtained when the Florida attorney came to Ottawa County *Page 15 
to get the guardian's signature on the settlement release. The probate court found the Florida attorney in contempt, ordered a fine and a jail-term, and ordered the attorney to remit $275,000 to the court. The Florida attorney appealed based on a lack of both subject matter and personal jurisdiction.
 {¶ 41} The Sixth District Court of Appeals reviewed the case primarily in terms of the power of the courts to enforce their orders by means of contempt proceedings. The appellate court held that the probate court had both statutory and inherent power to enforce its orders through contempt proceedings. Martin v. Guardianship of Jadwisiak (Feb. 8, 1991), 6th Dist. No. OT-89-24. As to the Florida attorney being subject to the March 2, 1988, order without being properly made a party or receiving notice, the Sixth District reasoned:
 {¶ 42} "Orders may be issued in favor of and against a non-party who `* * * is liable to the same process for enforcing obedience to the order as if he were a party.' Civ. R. 71. See, also, State, ex rel.Turner, v. Albin (1928), 118 Ohio St. 527. Civ. R. 71 `* * * is intended to eliminate the necessity of making persons technical parties to suits in order to reach a just and proper result.' Staff Notes to Civ. R. 71 (1970). In such proceedings, `[n]otice which apprises the defendant of the nature of the charge against him so that he may prepare a defense is sufficient to comply with the requirements of R.C. 2705.03.'Cincinnati v. Cincinnati District Coun[c]il 51 (1973), 35 Ohio St.2d 197
certiorari denied (1974), 425 U.S. 994, paragraph two of the syllabus.Albert v. Juengling Son Co. (1926), 115 Ohio St. 64. Service of the order or service of a `show cause' order upon a defendant constitutes sufficient notice." *Page 16 
 {¶ 43} The Sixth District held that the probate court had the authority to order the entire balance of the guardianship funds be remitted to the court under its in rem jurisdiction over the funds. The appellate court held that proper or improper service of process was not an issue because in rem proceedings are not adversarial, and because there is no rule or statute governing service of process in non-adversarial proceedings. The Sixth District reviewed the matter in terms of due process and adequate notice, and determined that the Florida attorney had been given adequate notice of the March 2, 1998, hearing, of the judgment resulting from that hearing, and of all subsequent orders, motions, hearings and court rulings. Ultimately, the Sixth District affirmed the probate court judgments, including the contempt judgment.
 {¶ 44} The Ohio Supreme Court reviewed the matter to determine issues regarding proper subject matter jurisdiction, personal jurisdiction, and due process. The Ohio Supreme Court held that the probate court not only had the authority, but also the duty to protect the ward's settlement funds, and determined that there were no errors regarding the probate court's subject matter jurisdiction over the proceedings relating to those funds. The Supreme Court confirmed that the probate court had in rem jurisdiction over the guardianship settlement funds. The Court next reviewed personal jurisdiction matters surrounding the contempt citation.
 {¶ 45} The Jadwisiak Court held that a probate court has authority to enforce its prior orders through contempt proceedings as set forth in R.C. 2101.23, which states:
 {¶ 46} "The probate judge may keep order in his court and has authority throughout the state to compel performance of any duty incumbent upon any *Page 17 
fiduciary appointed by or accounting to him. The probate judge may punish any contempt of his authority as such contempt might be punished in the court of common pleas.
 {¶ 47} "If a person neglects or refuses to perform an order or judgment of a probate court, other than for the payment of money, he shall be guilty of a contempt of court and the judge shall issue a summons directing such person to appear before the court, within two days from the service thereof, and show cause why he should not be punished for contempt. If it appears to the judge that such person is secreting himself to avoid the process of the court, or is about to leave the county for that purpose, the judge may issue an attachment instead of the summons, commanding the officer, to whom it is directed, to bring such person before such judge to answer for contempt. If no sufficient excuse is shown, such person shall be punished for contempt."
 {¶ 48} Jadwisiak further held that:
 {¶ 49} "Under this latter section, `[n]otice which apprises the defendant of the nature of the charge against him so that he may prepare a defense is sufficient to comply with the requirements of R.C. 2705.03.' Cincinnati v. Cincinnati Dist. Council 51 (1973),35 Ohio St.2d 197, 64 O.O.2d 129, 299 N.E.2d 686, at paragraph two of the syllabus, certiorari denied (1974), 415 U.S. 994, 94 S.Ct. 1597, 39 L.Ed.2d 892. The `sufficient notice' requirement is met by service of the order or service of a show cause order. Id. at 203,64 O.O.2d at 133, 299 N.E.2d at 692. See, also, State, ex rel. Beil v. Dota (1958),168 Ohio St. 315, 7 O.O.2d 36, 154 N.E.2d 634." Id. at 182. *Page 18 
 {¶ 50} Jadwisiak examined R.C. 2705.03, which provides for notice and a hearing as part of contempt proceedings: "a charge in writing shall be filed with the clerk of the court, an entry thereof made upon the journal, and an opportunity given to the accused to be heard, by himself or counsel. This section does not prevent the court from issuing process to bring the accused into court, or from holding him in custody, pending such proceedings."
 {¶ 51} The remainder of the Jadwisiak opinion discussed whether proper notice was provided to the Florida attorney. Notice, inJadwisiak, did not involve a single determination. The court looked at the notice given for a number of key aspects of the case: notice of the probate court's order to remit the settlement funds; notice of the court's affirmation of the 50/50 agreement to split the attorney fees; and the notice of the contempt proceedings. Jadwisiak found that the probate court approved the 50/50 fee-splitting arrangement between the attorneys at the same time that it ordered the Florida attorney to return all the settlement funds. Jadwisiak determined that the fee-splitting agreement was not an in rem proceeding, and that the Florida attorney could not be held in contempt of any ruling on the fee-splitting agreement until he had sufficient notice and an opportunity to be heard on that issue. It appeared that the probate court actually held the Florida attorney in contempt of violating the fee-splitting agreement rather than for violating the order to return the entire settlement proceeds to the court. Ultimately, the Ohio Supreme Court held that the Florida attorney was not afforded proper notice or due process on the issue of the fee-splitting agreement, and held that he could not have been in contempt for failing to obey orders regarding this agreement. *Page 19 
 {¶ 52} Jadwisiak provides several lessons applicable to this case: 1) most aspects of guardianship proceedings are in rem; 2) the probate court has the authority to issue ex parte orders regarding the res of the guardianship estate; 3) a probate court may make findings that affect the interested parties in a guardianship if the party has had notice of the proceedings and an opportunity to be heard; 4) an order to remit guardianship funds is an in rem order; 5) parties may be held in contempt for violating orders concerning the res of a guardianship estate if they have been given some appropriate notice and an opportunity to be heard; 6) a person receives sufficient notice (and can be held in contempt) in guardianship proceedings if that person is properly served with either the original order or a show cause motion; and 7) a person is entitled to separate notice and opportunity to be heard in the subsequent enforcement orders, such as contempt proceedings, in a guardianship case.
 {¶ 53} Turning to the matter at hand, the proceedings regarding the final account were in the nature of in rem proceedings. UnlikeJadwisiak, no contempt citation was issued, and thus, no service of process for contempt was required. The document that is alleged to have been improperly served was a motion for findings within the context of final accounting proceedings. According to Jadwisiak, the probate court has in rem jurisdiction to make findings when accounting for guardianship funds.
 {¶ 54} First Investors was given notice of the proceedings in a variety of ways, apart from the methods of notice found in Civ. R. 4.2. Obviously, First Investors had initial notice of the restrictions on the accounts when its officer signed the deposit *Page 20 
verification form and accepted the sequestered guardianship deposits. The probate court's judgment of December 8, 2004, was delivered to First Investors' corporate headquarters on 95 Wall Street, New York, New York. The judgment included notices to First Investors that funds were missing from the two guardianship accounts, that the guardian was being removed for neglect of duty and was being fined, and that a successor guardian was being appointed. One section of the order is specifically directed to First Investors: "IT IS FURTHER ORDERED that First Investors Corporation is hereby enjoined from transferring, disbursing or releasing any and all funds from the accounts * * *". The orders list all the specific accounts that were affected. These orders were served by certified mail.
 {¶ 55} Later orders, motions and rulings were served at First Investors' corporate offices in Cannonsburg, Pennsylvania. There is no indication service was ever refused or returned from either the New York City or Cannonsburg offices.
 {¶ 56} On March 29, 2005, the successor guardian served a "Motion to Surcharge" by ordinary mail on First Investors' office in Cannonsburg, addressed to Greeta Napoli, Esquire. This motion set forth more specific instances concerning the violation of prior court orders by First Investors, and demanded that First Investors account for the many unauthorized withdrawals from the two guardianship accounts.
 {¶ 57} On June 28, 2005, the successor guardian filed a motion to join First Investors as an additional party. A copy of the motion was sent to the Cannonsburg office. It appears that at this point, First Investors' counsel, Attorney Brian T. Johnson, became involved in the litigation. Attorney Johnson subsequently filed a *Page 21 
stipulation of extension of time along with the successor guardian. Further filings, motions, notices, orders and judgments were sent to Attorney Johnson.
 {¶ 58} On August 2, 2005, the successor guardian delivered a copy of a "Motion for Findings of Recovery" on First Investors, by ordinary mail, to Attorney Jonathan M. Bryan in Columbus. This motion described in even more detail the factual liability issues being raised against First Investors.
 {¶ 59} The parties then entered into settlement negotiations. The court scheduled a variety of status conferences, and ultimately set a final hearing for July 27, 2006. Notice of this hearing was sent to Attorney Johnson.
 {¶ 60} Up to this point, First Investors had been notified at three different locations of the probate court's orders and the allegations regarding improprieties with the guardianship accounts. This might not be the most organized method of service, but there is no question that First Investors had notice and an opportunity to be heard throughout the proceedings, including notice of the July 27, 2006, hearing. This is all in addition to First Investors' initial submission to the court's jurisdiction based on the signature of one of its officers on the deposit and verification forms. Because the probate court did not actually order a monetary judgment against First Investors, and made findings against First Investors in an in rem proceeding that comports with due process, we conclude that no reversible error appears regarding the probate court's jurisdiction or service of process. Any future enforcement action against First Investors involving an in personam judgment would, of course, be required to conform to the rules governing service of process. *Page 22 
 {¶ 61} Based on the foregoing, we overrule First Investors' first assignment of error.
 MR. THOMAS OHIO CASUALTY ASSIGNMENTS OF ERROR NOS. 1 AND2 {¶ 62} "THE COURT OF COMMON PLEAS OF MONROE COUNTY, PROBATE DIVISION WAS WITHOUT JURISDICTION TO ENTER ITS ORDER AFTER THE MINOR WARD ADRIENNE THOMAS REACHED THE AGE OF MAJORITY ON JULY 21, 2004."
 {¶ 63} "JAMES PETERS, THE COURT APPOINTED SUCCESSOR GUARDIAN FOR ADRIENNE THOMAS HAS NO STANDING TO BRING A CLAIM ON BEHALF OF ADRIENNE THOMAS."
 {¶ 64} In these two assignments of error Appellants argue essentially the same thing: the probate court's subject matter jurisdiction over Adrienne's guardianship ended when Adrienne reached her 18th birthday on July 21, 2004. Subject matter jurisdiction may be raised at any time by any party, or by the court itself. In re Guardianship of Kinney (June 14, 2000), 7th Dist. No. 99-BA-19. "It is well-settled that proceedings in probate court are restricted to those actions permitted by statute and by the Constitution, since the probate court is a court of limited jurisdiction." Corron v. Corron (1988), 40 Ohio St .3d 75, 77,531 N.E.2d 708. The relevant jurisdictional statute in this case is R.C. 2101.24(A)(1), which states, in pertinent part:
 {¶ 65} "(A)(1) Except as otherwise provided by law, the probate court has exclusive jurisdiction: *Page 23 
 {¶ 66} "* * *
 {¶ 67} "(e) To appoint and remove guardians, conservators, and testamentary trustees, direct and control their conduct, and settle their accounts;"
 {¶ 68} The Ohio Supreme Court ruled on September 19, 2007, that, "[w]hen a guardianship is predicated exclusively on a ward's minor status, the guardian's power and the probate court's jurisdiction both terminate when the ward reaches the age of majority." In re Guardianshipof Hollins, 114 Ohio St.3d 434, 2007-Ohio-4555, syllabus. This does not end the matter. The Supreme Court was also required to determine whether the probate court had any authority to approve the guardian's final account after the ward reached majority. The Supreme Court held that the probate court has this additional jurisdiction even after the ward's 18th birthday, citing R.C. 2109.302(A), which states, in pertinent part: "every guardian or conservator shall render a final account within thirty days after completing the administration of the ward's estate or within any other period of time that the court may order."Hollins held that this statute provides, "an independent grant of jurisdiction to the probate court for the consideration and settlement of a guardian's final account; it does not provide jurisdiction beyond a minor's age of majority for other purposes." Id. at ¶ 27.Hollins remained consistent with prior Supreme Court rulings on this subject. State ex rel. Estate of Hards v. Klammer, 110 Ohio St.3d 104,2006-Ohio-3670, 850 N.E.2d 1197 (probate court has jurisdiction to award fees to former guardian from guardianship funds even after the death of the ward); State ex rel. Beedle v. Kiracofe (1964), 176 Ohio St. 149,198 N.E.2d 61 (former guardian has authority to prosecute *Page 24 
writ of prohibition action even after the death of the ward in order to effectuate final accounting of the ward's estate.).
 {¶ 69} The record reflects that all the proceedings at issue in this appeal relating to Adrienne Thomas involve the final account in her guardianship. The original guardian, Mr. Thomas, failed to provide the necessary information for a proper accounting, and the probate court appointed Attorney Peters to oversee the final accounting. During this time period, Adrienne reached her 18th birthday, on July 21, 2004. In December of 2004, Attorney Peters was appointed as the successor guardian of both Adrienne and Kerri Jo. Although it was most likely not entirely accurate to designate Attorney Peters as successor "guardian" to Adrienne after her 18th birthday, the court continued to have jurisdiction over the final accounting and the court was free to appoint any qualified person to assist in that accounting. The court initially appointed Attorney Peters under the authority of R.C. 2109.49, which states: "The probate judge, when the probate judge deems it necessary or upon the written application of any party interested in the trust estate, may appoint suitable persons to investigate the administration of the trust and report to the court." There are other statutes which also give the probate judge additional authority to appoint Attorney Peters to oversee the final account. See, e.g., R.C. 2109.26 (probate court may appoint any suitable person to file an account for a fiduciary who dies, is removed as fiduciary, or who is unable to execute a trust to its termination); R.C. 2109.302 (probate court may appoint suitable person or commissioner to examine the accounts held by a guardian). It is Attorney Peters' authority, not the name used to describe that authority, that concerns us here. *Page 25 
 {¶ 70} The transcript of the final accounting hearing, held July 27, 2006, indicates that the parties had notified the court on July 21st that there was a problem concerning Attorney Peters' authority and designation as successor guardian. (Tr., p. 10.) Although the judge may have been unsure as to what title to give to Attorney Peters regarding Adrienne's guardianship estate, he allowed the hearing to continue. This appears to have been the proper action, since Attorney Peters was acting properly as guardian to Kerri Jo and had authority as successor fiduciary, or simply as a suitable person appointed by the court, to attend to the final accounting of Adrienne's guardianship estate.
 {¶ 71} Ohio Casualty and Mr. Thomas raise a further issue concerning the scope of the probate court's authority, and whether the court had authority (in Adrienne's guardianship estate) to cite Mr. Thomas for contempt and to charge the bonding company after Adrienne reached her 18th birthday. Appellants' argue that these actions are inconsistent with approving the final accounting. They claim that the sole authority of court at this point is to approve the final accounting submitted by Mr. Thomas. In other words, the court must rubber-stamp with its approval any final account submitted. This is a not a persuasive argument. The process of approving the final accounting is not simply a ministerial matter of taking the report from the guardian and filing it with the court. If this were the extent of the final accounting, there would be no elaborate procedures, described in R.C. 2109.302, for validating each and every aspect of the account, for appointing special commissioners to examine the assets of the account, for appointing alternative fiduciaries to investigate problems with the account, and for the court to examine the guardian under oath. In *Page 26 
point of fact, the probate court has complete authority over the final accounting, as set forth in R.C. 2109.32(A): "[T]he court shall inquire into, consider, and determine all matters relative to the account and the manner in which the fiduciary has executed the fiduciary's trust, including the investment of trust funds, and may order the account approved and settled or make any other order as the court considers proper." If the probate court has independent jurisdiction to settle the final account of the ward, as held by Hollins, this jurisdiction is actually quite extensive with respect to that task.
 {¶ 72} It is true that an action on a bond can be a separate action apart from the final account, pursuant to 2109.61, which states:
 {¶ 73} "An action may be prosecuted on the bond of a fiduciary against any one or more of the obligors thereof by any person who has been injured by reason of the breach of any condition of the bond. Such action shall be prosecuted for the benefit of all persons who are interested in the estate and who have been similarly injured. Any such person or any obligor on the bond who is not already a party to the action may intervene therein or be made a party thereto by supplemental, amended, or crosspetition.
 {¶ 74} "If a surety on the bond of a fiduciary is not made a party to an action or proceeding against such fiduciary, the fact that a judgment was rendered or an order was entered against the fiduciary shall constitute only prima-facie evidence of the justice and validity of the claim in an action subsequently brought against the sureties on the bond of the fiduciary." *Page 27 
 {¶ 75} Normally, an action against the bond is initiated after the fiduciary is determined to be liable for some loss to the estate. "The proper method of determining the liability of a fiduciary for purposes of triggering the liability of a surety on its bond is to settle the account of the fiduciary. If a fiduciary fails or refuses to file an account, it is the obligation of a successor fiduciary appointed by the court to file an account for the former fiduciary. Once the liability of the former fiduciary has been determined by the probate court, it is appropriate to commence a surcharge action against the surety on the former fiduciary's bond." Schraff v. Harrison (1998),94 Ohio Misc.2d 104, 107, 703 N.E.2d 877. "Ohio courts have generally held that an action accrues against the surety on a bond when `some sort of determination or adjudication of the liability of the principal has occurred.' Cleveland City School Dist. Bd. of Edn. v. United PacificIns. Co. (June 28, 1991), Cuyahoga App. No. 60374." In re Estate ofBiship, 2nd Dist. No. 20102, 2004-Ohio-2197, ¶ 15.
 {¶ 76} Although the normal procedure is to pursue the surety in a separate proceeding after the fiduciary is found liable, that does not necessarily mean that it is the only method of winding up the affairs of a guardianship estate during the final accounting. There are situations in which the probate court has concurrent jurisdiction to either deal with estate matters during an accounting or to pursue those matters in a separate action distinct from the accounting. See, e.g., In re Estate ofKelsey, 165 Ohio App.3d 680, 2006-Ohio-1171, 847 N.E.2d 1277. Further, when the surety and fiduciary are both parties to an action, and where the surety actively participates in the proceedings, the probate court's ruling may encompass both the fiduciary and surety. In re Grant (1978),56 Ohio App.2d 207, 381 N.E.2d 1348. *Page 28 
 {¶ 77} The circumstances of the instant case do seem to present an unusual set of circumstances. At the time of the final account hearing, there were two wards, one under age 18 and one who turned 18 during the accounting process. There was a failure of the original guardian to render any proper accounting. The court appointed a successor guardian, while at the same time realizing that Adrienne would no longer need a guardian once she attained age 18. The former guardian, the successor guardian and the bond company were all part of the proceedings to settle the guardianship accounts. Although it might have been more organized to separately clear up some issues, such as the title of Attorney Peters, the state of Adrienne's guardianship, and the role Ohio Casualty was taking in the proceedings, every action taken by the court was done in the course of rendering the estate accounts. Perhaps Ohio Casualty should have objected at the time that it was not yet a proper party to the proceedings. Perhaps one or more parties could have alerted the court that Adrienne had turned 18, thus affecting the type of accounting that was being done and changing Attorney Peters' role in the proceedings. These apparent oversights do not affect the jurisdiction of the probate court to proceed with a final accounting in Adrienne's guardianship estate, given the clear holding in Hollins that the probate court has such ancillary jurisdiction after the ward turns 18, and given the broad scope of such jurisdiction as defined in R.C. 2109.32.
 {¶ 78} Appellants have further argued that the probate court had no authority to issue a citation to the former guardian, Mr. Thomas, once Adrienne turned 18. The authority to issue a citation to a guardian or any other fiduciary is a corollary power in rendering a final account of the estate. R.C. 2109.31 states, in pertinent part: *Page 29 
 {¶ 79} "(A) If a fiduciary neglects or refuses to file an account, inventory * * * or report when due * * * the court at its own instance may issue * * * a citation as described in division (B) of this section * * * to compel the filing of the overdue account, inventory, certificate of notice of probate of will, or report.
 {¶ 80} "(B) The citation that is required by division (A) of this section may contain any of the following:
 {¶ 81} "(1) A statement that the particular account, inventory, certificate of notice of probate of will, or report is overdue;
 {¶ 82} "(2) An order to the fiduciary to file the account, inventory, certificate of notice of probate of will, or report, or otherwise to appear before the court on a specified date;
 {¶ 83} "(3) A statement that, upon the issuance of the citation, a continuance to file the account, inventory, certificate of notice of probate of will, or report may be obtained from the court only on or after the date specified pursuant to division (B)(2) of this section.
 {¶ 84} "(C) If a citation is issued to a fiduciary in accordance with divisions (A) and (B) of this section and if the fiduciary fails to file the account, inventory, certificate of notice of probate of will, or report prior to the appearance date specified in the citation, the court may order, on that date, one or more of the following:
 {¶ 85} "(1) The removal of the fiduciary;
 {¶ 86} "(2) A denial of all or part of the fees to which the fiduciary otherwise would be entitled; *Page 30 
 {¶ 87} "(3) A continuance of the time for filing the account, inventory, certificate of notice of probate of will, or report;
 {¶ 88} "(4) An assessment against the fiduciary of a penalty of one hundred dollars and costs of twenty-five dollars for the hearing, or a suspension of all or part of the penalty and costs;
 {¶ 89} "(5) That the fiduciary is in contempt of the court for the failure to comply with the citation and that a specified daily fine, imprisonment, or daily fine and imprisonment may be imposed against the fiduciary, beginning with the appearance date, until the account, inventory, certificate of notice of probate of will, or report is filed with the court;
 {¶ 90} "(6) If the fiduciary does not appear in the court on the specified appearance date, that the fiduciary is in contempt of the court for the failure to comply with the citation, and that one of the following may occur:
 {¶ 91} "(a) The fiduciary shall be taken into custody by the sheriff or a deputy sheriff and brought before the court.
 {¶ 92} "(b) The fiduciary shall appear before the court on a specified date or otherwise be taken into custody by the sheriff or a deputy sheriff and brought before the court."
 {¶ 93} The statute is clear. A citation in contempt may be issued so that an accounting may take place. Again, once the probate court has jurisdiction to render a final accounting, it has jurisdiction to do those things which make the accounting possible, such as forcing the former guardian to produce the financial records during his guardianship, and holding him in contempt if he does not produce those records. *Page 31 
The fact that the citation might be issued after the ward's 18th birthday does not appear to be material, because one would presume that a final account for a minor ward usually occurs after the ward's 18th birthday. Thus, any act needed to be taken in furtherance of that final account would also be expected to occur after the ward's 18th birthday.
 {¶ 94} Based on the above analysis, we hold that the probate court had jurisdiction over the final accounting of Adrienne's former guardianship estate, and had jurisdiction over Ohio Casualty and Mr. Thomas during those proceedings. The successor guardian, Attorney Peters, should not technically have been called a "guardian" with respect to Adrienne, but he clearly had authority to oversee the final account process as a successor fiduciary or suitable court appointee. Appellants' first two assignments of error are, therefore, overruled.
 MR. THOMAS AND OHIO CASUALTY ASSIGNMENT OF ERROR NO. 3 {¶ 95} "THE DECISION OF THE COURT OF COMMON PLEAS OF MONROE COUNTY, PROBATE DIVISION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 96} Appellants present two main arguments as to why the evidence does not support the probate court's decision. First, they argue that the $80,000 judgment from the wrongful death action should have gone to Mr. Thomas directly and not to his children. Appellants argue that it was this $80,000 that Mr. Thomas spent from the two guardianship accounts deposited at First Investors. The second argument is that the probate court failed to credit Mr. Thomas with the full amount of expenditures *Page 32 
he made for his two daughters. Based on the record, both arguments are without merit.
 {¶ 97} The Ohio Supreme Court, in C.E. Morris Co. v. Foley Constr.Co. (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, explained the standard of review of the manifest weight of the evidence in a civil case: "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." Id. at syllabus. When reviewing a judgment for manifest weight of the evidence, an appellate court will presume that the findings of the trier of fact are correct. Seasons Coal Co., Inc. v. Cleveland (1984),10 Ohio St.3d 77, 80-81, 10 OBR 408, 461 N.E.2d 1273. This presumption arises because the trial judge had an opportunity, "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Id. at 80, 10 OBR 408, 461 N.E.2d 1273. "A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." Id. at 81, 10 OBR 408, 461 N.E.2d 1273.
 {¶ 98} The main problem with Appellants' first argument is that it is a collateral attack on a final judgment in Susan Thomas' probate estate, and that final order was never appealed. Mr. Thomas, unilaterally, decided sometime after judgment had been rendered that he should have been awarded $80,000 from a $103,000 *Page 33 
settlement of wrongful death and survival claims in the estate of Susan Thomas, Monroe County Court of Common Pleas, Probate Division, Case No. 8264. The record reflects that Mr. Thomas, in fact, signed and filed the "Report of Distribution of Wrongful Death and Survival Claims" in Susan Thomas' estate case. That document clearly awards $40,000 each to Adrienne and Kerri Jo, and $0 to Appellant, Mr. John Thomas. (7/27/2006 Final Account Hearing, Exhibits, 2/28/2000 Entry Approving Settlement.) The remaining funds were ordered partly to go to an emancipated daughter, Jennifer Majors, and partly to pay expenses of the estate. Mr. Thomas signed that document as the fiduciary of the probate estate. There is no indication that this judgment was ever appealed, and Mr. Thomas would have been the person to initiate such an appeal.
 {¶ 99} Under the doctrine of res judicata, "`[an existing] final judgment or decree rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction is conclusive of rights, questions and facts in issue * * * and is a complete bar to any subsequent action on the same claim or cause of action between the parties or those in privity with them.'" Painter v. Graley (1995), 106 Ohio App.3d 770, 773,667 N.E.2d 78, quoting Norwood v. McDonald (1943), 142 Ohio St. 299,27 O.O. 240, 52 N.E.2d 67, paragraph one of the syllabus. The doctrine of res judicata provides that an existing judgment or decree between the parties is conclusive as to all claims that were or might have been litigated in a first lawsuit. Natl. Amusements, Inc. v. Springdale
(1990), 53 Ohio St.3d 60, 62, 558 N.E.2d 1178.
 {¶ 100} There is no indication in the record that Mr. Thomas, prior to the court's distribution of the proceeds from the wrongful death settlement in his wife's *Page 34 
estate, expected that those funds would be distributed to him personally or could be used for his own benefit. This simply seems to be a theory he developed after he had already begun to spend the money. If Mr. Thomas believed the wrongful death distribution was improper, he should have objected to the probate court in his wife's estate, and any error should have been appealed. If he believed that the wrongful death proceeds should not be awarded to a guardianship estate, he could have appealed that issue. If he believed that he should have been compensated for a loss of consortium claim, he should have filed an appeal. If he believed that the proceeds should have been characterized as survivorship benefits rather than wrongful death benefits, he should have appealed the judgment. Mr. Thomas signed the distribution order of the division of the wrongful death proceeds on March 10, 2000, and there is no indication that the order was ever challenged, disputed, or appealed. Mr. Thomas was intimately involved in the proceedings that ultimately resulted in a settlement to his daughters. He was the fiduciary of the probate estate, so he cannot claim that he was somehow caught unaware about the results of the settlement.
 {¶ 101} Mr. Thomas further argues that the probate court did not approve of every item that he listed as an estate expense. It is abundantly clear from this record that Mr. Thomas never sought required court approval prior to making any of the expenses claimed in the belated accounting proceedings. The probate court is the superior guardian of the ward, and the guardian only acts as an officer of the court in order to provide for the best interests of the ward. R.C. 2111.50(A)(1). The guardian has the duty to manage the estate in the child's best interests. R.C. 2111.14(B). "Traditionally, a guardian is limited to taking custody of a ward's property, protecting it *Page 35 
and, with the court's approval, making a certain disposition of it."Toledo Trust Co. v. Natl. Bank of Detroit (1976), 50 Ohio App.2d 147,159, 362 N.E.2d 273. The probate court is not required to approve the expenses claimed by the guardian. Instead, the court exercises its discretion in reviewing the claimed expenses. An appellate court reviews the probate court's determination only for abuse of discretion. In reGuardianship of Lauder, 150 Ohio App.3d 277, 2002-Ohio-6102,780 N.E.2d 1025, ¶ 34; In re Guardianship of Brockman, 160 Ohio App.3d 112,2005-Ohio-1333, 826 N.E.2d 320, ¶ 12.
 {¶ 102} R.C. 2111.13(A) sets forth the duties of the guardian, and in so doing, sets limits on what types of expenses will be permitted in the guardianship:
 {¶ 103} "(A) * * * the guardian's duties are as follows:
 {¶ 104} "* * *
 {¶ 105} "(2) To provide suitable maintenance for the ward when necessary, which shall be paid out of the estate of such ward upon the order of the guardian of the person;
 {¶ 106} "(3) To provide such maintenance and education for such ward as the amount of the ward's estate justifies when the ward is a minor and has no father or mother, or has a father or mother who fails to maintain or educate the ward, which shall be paid out of such ward's estate upon the order of the guardian of the person[.]"
 {¶ 107} Some of the operative words here are "suitable," "necessary," and "justifies." These are determinations to be made by the probate judge when reviewing any claimed expenses. Simply because the guardian expends money and *Page 36 
then tries to convince the court after the fact that the expenses were necessary is no guarantee that the probate court will come to the same conclusion. In fact, the probate court would be more likely to view such actions with considerable skepticism.
 {¶ 108} R.C. 2111.13(A)(3) mandates that guardianship expenditures are a supplement to the expenditures that the ward's parents are required to make to support the child, if one or both parents are available to support the child. This could explain why the probate court did not retroactively approve such expenses as $600 per month in food, clothing and incidentals, since these are expenses that Mr. Thomas, as a parent, would be expected to incur in raising his children. Obviously, a parent is required by law to support his or her minor children, and it is a criminal offense not to do so. R.C. 2919.21. Mr. Thomas appears to believe that he had no duty to support his children except through guardianship funds, but he provides no legal basis for this conclusion. He also presupposes that the trial court was required to accept his evidence about the alleged expenses, when in fact, the probate judge, as the trier of fact, could believe or disbelieve any of the evidence presented by Mr. Thomas. Given that all the expenses were being justified well after they supposedly occurred, and only after repeated orders by the court to explain the shortfalls in the accounts, the court could easily have rejected all the expenses as unnecessary, unjustified or simply unsupported by the record. In actuality, the court did approve of most of the expenses presented by Mr. Thomas.
 {¶ 109} None of Appellants' arguments are persuasive, and this assignment of error is hereby overruled. *Page 37 
 MR. THOMAS AND OHIO CASUALTY ASSIGNMENT OF ERROR NO. 4 {¶ 110} "A FORMER GUARDIAN, UNDER BOND, AND HIS SURETY ARE NOT RESPONSIBLE FOR FUNDS PLACED IN A DEPOSITORY PURSUANT TO PROBATE COURT ORDER."
 FIRST INVESTORS ASSIGNMENT OF ERROR NO. 2 {¶ 111} "THE TRIAL COURT ERRED IN FINDING APPELLANT FIRST INVESTORS CORPORATION LIABLE UNDER R.C. 2109.13 SINCE THAT SECTION DOES NOT PROVIDE FOR LIABILITY AGAINST A DEPOSITORY BANK AND THERE IS NO EVIDENCE OR FINDING OF FACT THAT FIRST INVESTORS CORPORATION VIOLATED A COURT ORDER."
 {¶ 112} These two assignments of error will be treated together because they deal with the particular nature of the account in which the wards' assets were deposited, and the manner in which it affects liability. Basically, First Investors and Ohio Casualty are each arguing that the other is liable for any loss to the guardianship estates. First Investors argues that, although the funds were deposited as sequestered funds under R.C. 2109.13, the impoundment statute does not provide for any liability on the part of the depository bank. Mr. Thomas and Ohio Casualty similarly contend that they cannot be liable under R.C. 2109.13. They argue that the very purpose of impounding funds under R.C. 2109.13 is to relieve the guardian of liability. They assert that the only entity that could be found liable is the depository bank. It is their belief that First Investors should be held solely responsible for allowing any funds to be withdrawn without specific court authorization. *Page 38 
 {¶ 113} R.C. 2109.13, sometimes referred to as the "Ohio Impoundment Law," states:
 {¶ 114} "In any case in which a bond is required by the probate court from a fiduciary and the value of the estate or fund is such that the court deems it inexpedient to require security in the full amount prescribed by section 2109.04 of the Revised Code, the court may direct the deposit of any suitable personal property belonging to the estate or fund with a bank, savings bank, savings and loan association, credit union, or trust company incorporated under the laws of this state or of the United States, as may be designated by order of the court.
 {¶ 115} "The deposit shall be made in the name of the fiduciary, andthe personal property deposited shall not be withdrawn from the custodyof the bank, savings bank, association, credit union, or trust companyexcept upon the special order of the court. No fiduciary shall receive or collect the whole or any part of the principal represented by the personal property without the special order of the court. Such an order can be made in favor of the fiduciary only if the court within its discretion, having regard for the purpose for which the order is requested, the disposition to be made of the assets as may be released, the value of the assets as related to the total value of the estate, and the period of time the assets will remain in the possession of the fiduciary, finds that the original bond previously given and then in force will be sufficient to protect the estate; otherwise, the court, as a condition to the release of the personal property deposited, shall require the fiduciary to execute an additional bond in an amount that the court determines. *Page 39 
 {¶ 116} "After the deposit has been made and after the filing with thecourt of a receipt for the personal property executed by the designatedbank, savings bank, association, credit union, or company, which receiptshall acknowledge that the personal property is held by the bank, savings bank, association, credit union, or company subject to the orderof the court, the court may fix or reduce the amount of the bond so thatthe amount of the penalty of the bond is determined with respect to thevalue of the remainder only of the estate or fund, without including the value of the personal property deposited. Neither the fiduciary nor thefiduciary's sureties shall be liable for any loss to the trust estateresulting from the deposit as is authorized and directed by the courtpursuant to this section, if the fiduciary has acted in good faith.
 {¶ 117} "This section may be invoked simultaneously with the initial application for appointment of the fiduciary if an interim receipt of the bank, savings bank, association, credit union, or company for which the application for appointment as depositary is being made, acknowledging that it already has received temporary deposit of the personal property described in the application for appointment as depositary, accompanies the simultaneous applications for appointment of fiduciary and for appointment of the depositary." (Emphasis added.)
 {¶ 118} The staff notes to R.C. 2109.13 state: "Sec. 2109.13, R. C, permits a fiduciary upon court order to deposit assets with a bank or trust company and be relieved of bond with respect to such assets." *Page 40 
 {¶ 119} There is no question that the initial deposits of $100,000 and $27,000 were deposited pursuant to R.C. 2109.13. (12/20/99 Report of Distribution and Entry Minor's Claim).
 {¶ 120} First Investors argues that this statute does not address liability issues and only explains how funds can be deposited so that a bond can be reduced. However, the statute clearly deals with the general issue of liability: "Neither the fiduciary nor the fiduciary's sureties shall be liable for any loss to the trust estate resulting from the deposit as is authorized and directed by the court pursuant to this section, if the fiduciary has acted in good faith." Although in the language of the statute it does not explicitly state that the depository institution is liable for any loss, by relieving the guardian and the surety from liability, the depository institution is the sole remaining entity should a court determine that misuse of funds occurred.
 {¶ 121} The few cases dealing with this subject have all concluded, or at least inferred, that the depository bank is responsible for any loss of funds if they are released from a sequestered account without permission from the court. In In re Brown (1948), 51 Ohio L. Abs 129, 79 N.E.2d 340, the Ross County Probate Court determined that the impoundment statute was an alternative to the requirement that guardians file a bond in the probate court. The court found that property deposited in a bank pursuant to the Impoundment Law remained in the constructive custody of the court, while legal title rested with the ward. Brown indicated that the Impoundment Statute promotes flexibility, while, "imposing] liability for the trust property on those responsible for its safekeeping[.]" Id., 79 N.E.2d at 352. *Page 41 
 {¶ 122} In the matter of Guardianship of Vicki Jenkins (June 4, 1993), 11th Dist. No. 92-P-0081, the court held that, under R.C. 2109.13, "before a court can order a bank to replace sequestered funds which were released to a fiduciary without a court order, the record must reveal that the bank received a copy of the sequestration decree, and that it acknowledged such order." In Jenkins, the bank had never been notified that it could not release the funds without a court order, so it was not held liable. On the record before us, there can be no question that First Investors acknowledged that the funds were being deposited under court order and that they could not be released without a further court order.
 {¶ 123} In Graham v. Ravenna Savings Loan Co. (Dec. 7, 1993), 11th Dist. No. 93-P-0021, the Eleventh District Court of Appeals held that it was proper to grant summary judgment against the depository bank for violating the impoundment order included with the verification signed by the bank pursuant to R.C. 2109.13. In Graham, a child received a settlement of over $38,000 arising from a personal injury claim. The funds were put into a sequestered bank account, and the child's mother was named guardian of the estate of the child. The funds were placed into the account subject to court order that, "no person shall remove anything from said depository prior to the age of majority without the written approval of this court." Id. at *1. The mother withdrew funds from the sequestered account without authorization from the court, and a guardian ad litem was eventually appointed to recover the funds. The mother had absconded and could not be located, so the guardian ad litem proceeded solely against the depository bank. The Eleventh District Court of Appeals agreed with the probate court that the guardian ad litem was free to recover *Page 42 
the funds from either the depository bank or the former guardian, because they were essentially joint tortfeasors in violation of R.C. 2109.13, and in violation of the court ordered conditions of the sequestered account.
 {¶ 124} First Investors cites one case supposedly contradicting this caselaw; Rinehart v. Ohio Farmers Insurance Company (1998),125 Ohio App.3d 719, 709 N.E.2d 559. We note at the outset that the court in this case does not even mention R.C. 2109.13 and the case does not involve a situation where a depository bank signed a deposit verification agreeing not to release funds without further court order. In Rinehart, the guardian was given letters of appointment. Those letters stated that no funds should be withdrawn from the guardianship accounts except by further order of the court. The guardian showed his letters of appointment to the bank, and the bank then created a normal guardianship account, not a sequestered account. The bank, itself, did not enter into any agreement concerning how or when to release funds to the guardian. The guardian made numerous unauthorized withdrawals, and the bonding company (the same bonding company, Ohio Casualty, as in the instant case) brought an action under R.C. 2109.50 against the depository bank.
 {¶ 125} R.C. 2109.50 describes an action for reclaiming assets that are concealed or embezzled. The probate court, "concluded that Bank One had no duty to exercise control over Glenn Parks's spending of the funds in the Bank One account, because the account was an uncontrolled guardianship account, which placed no supervisory duty upon the bank." Id. at 725. On appeal, the Eleventh District Court of Appeals generally affirmed the probate court's judgment, although it *Page 43 
did reverse and remand the case to determine whether the depository bank had actual knowledge of the misappropriation of estate funds by the guardian.
 {¶ 126} Rinehart does not support First Investors' argument in any fashion. It did not involve a sequestered account. It did not involve a deposit verification signed by the bank clearly stating that release of the funds was subject to further court order. It did not involve R.C. 2109.13. In short, Rinehart dealt with a different problem arising from different facts.
 {¶ 127} Our research has not divulged any case or statutory law supporting First Investors' argument or to relieve First Investors from liability. However, this conclusion does not necessarily lead to the conclusion that Mr. Thomas and Ohio Casualty are relieved from liability. R.C. 2109.13 relieves the guardian and its surety from liability arising from loss arising from the sequestered deposit only when the guardian acts in good faith. Although the probate judge did not use the words "bad faith" to describe Mr. Thomas' actions, the words actually used in the court's judgment entries appear to be the functional equivalent. The court found, "by clear and convincing evidence that the former Guardian, John R. Thomas, failed to properly perform his lawful duties as Guardian and acted in a wanton and willful manner in regard thereto[.]" (10/11/06 J.E., p. 19.)
 {¶ 128} "A lack of good faith is the equivalent of bad faith, and bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another." Slater v. *Page 44 Motorists Mut. Ins. Co. (1962), 174 Ohio St. 148, 187 N.E.2d 45, at paragraph two of the syllabus.
 {¶ 129} "`Bad faith' has also been defined as `that which imports a dishonest purpose and implies wrongdoing or some motive of self-interest.'" Master Chem. Corp. v. Inkrott (1990), 55 Ohio St.3d 23,28, 563 N.E.2d 26.
 {¶ 130} Although "bad faith" has no single clear definition, the various definitions that can be found certainly encompass willful and wanton negligence and failure to perform one's duties. There is no other way to read this record except to conclude that Mr. Thomas did not consider himself to be constrained by the probate court's orders, and felt that he could spend the guardianship funds without explaining himself to the probate court. The record discloses a rather overt example of bad faith, regardless of the definition used.
 {¶ 131} Appellants also attempt to rely on the fact that Mr. Thomas' malfeasance did not impact the first deposits into the sequestered accounts, but affected only the $40,000 later deposited into each account from the wrongful death settlement; funds that were not initially deposited under any court order. It is unclear how this supposed distinction supports any of the arguments on appeal. There are only two bank accounts (one for each daughter) at issue in this appeal. If more than one type of asset was deposited in those accounts, the record reflects that the deposits were commingled, and thus, any loss to the guardianship estate cannot be apportioned to either the initial deposits of $100,000 and $27,000, or the later deposits of $40,000 each. If there were some means of distinguishing the trail of withdrawals relating to each distinct deposit, Appellants did not present such *Page 45 
evidence to the probate court. Further, while the $40,000 deposits may not have been ordered to be placed in sequestered accounts, once the money was so deposited and commingled it is subject to the same requirements as the initial deposits.
 {¶ 132} Each party's attempt to deflect liability to other parties in this case is not persuasive, and these assignments of error are overruled.
 FIRST INVESTORS ASSIGNMENT OF ERROR NO. 3 {¶ 133} "THE TRIAL COURT ERRED IN FINDING APPELLANT FIRST INVESTORS CORPORATION LIABLE FOR FAILURE AND NEGLECT TO ACT IN AN APPROPRIATE, WATCHFUL MANNER TO PROTECT THE INTERESTS OF THE MINOR WARDS BECAUSE IT SATISFIED ITS DUTY UNDER COURT ORDER."
 {¶ 134} It is difficult to determine what First Investors is arguing here, and there is no actual argument in its brief corresponding to this assignment of error. First Investors' liability is based on the dozens of "telephone redemption" withdrawals that Mr. Thomas made without obtaining prior authorization from the court. First Investors also charged a substantial fee for each of these withdrawals. These withdrawals totaled over $100,000, as documented by written records submitted at the July 27, 2006, hearing. The court found the total loss to Adrienne's estate to be $38,758.47, plus interest, and the loss to Kerri Jo's estate to be $29,183.82, plus interest. First Investors was liable because it released funds without prior authorization of the court, and thereby disobeyed a direct court order. The fact that First Investors might otherwise have done an excellent job in managing the funds it *Page 46 
retained does not excuse it from liability for the unlawful withdrawals initiated by Mr. Thomas. The record clearly indicates the basis of its liability, and this assignment of error is without merit.
 {¶ 135} None of the assignments of error by any of the Appellants has merit, and the probate court's judgments in both guardianship cases are affirmed in full.
 Vukovich, J., concurs. DeGenaro, P.J., concurs. *Page 1